# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**GISELLE CUNNINGHAM**
            **Plaintiff,**

        **v.**                                    **Case No. 14-C-420**

**CAROLYN COLVIN,**
**Acting Commissioner of the Social Security Administration**
            **Defendant.**

---

## DECISION AND ORDER

Plaintiff Giselle Cunningham applied for social security disability benefits, claiming that she could not work due to back problems, obesity, and diabetes. The Social Security Administration ("SSA") denied her application initially and on reconsideration, as did an administrative law judge ("ALJ") after a hearing. The Appeal Council denied review, making the ALJ's decision the final word from the Commissioner on the application. See Scrogham v. Colvin, 765 F.3d 685, 695 (7th Cir. 2014).

Plaintiff now seeks judicial review. For the reasons set forth below, I reverse the ALJ's decision and remand for further proceedings.

## I. FACTS AND BACKGROUND

### A.    Medical Evidence

Plaintiff injured her back at work in 2008, and subsequent scans revealed multi-level lumbar disc degeneration and protrusions. (Tr. at 266-67, 286.) She received treatment

including pain medications (Medrol Dosepak,[1] Vicodin,[2] and Flexeril[4]), epidural injections, and physical therapy, which failed to fully resolve her symptoms.[5]  (Tr. at 268-77, 279, 282.)  She was not considered a good surgical candidate because of her young age and obesity.  (Tr. at 279.)

In March 2010, plaintiff began seeing a pain management specialist, Dr. Jeffrey Gorelick, reporting problems handling her daily responsibilities and performing self-care.  (Tr. at 365-66.)  She reported that the pain was so severe she had to lie down several times per day and had considerable functional limits.  Dr. Gorelick recommended that she remain off work and continue on hydrocodone and cyclobenzaprine, with physical therapy shifting to a myofascial program.  (Tr. at 368.) However, her pain and functional limitations persisted.  (Tr. at 362.)  Dr. Gorelick performed trigger point injections (Tr. at 358-60), but plaintiff reported only slight improvement, and Dr. Gorelick kept her off work (Tr. at 355-56).  In May 2010, Dr. Gorelock obtained an EMG study, which was abnormal, suggestive of polyneuropathy.  (Tr. at 352-53.)  In June 2010, Dr. Gorelick noted that, given the minimal change from treatment, including sustained physical therapy, plaintiff's symptoms were most likely permanent and

_____

[1]Methylprednisolone is a steroid that prevents the release of substances in the body that cause inflammation.  http://www.drugs.com/mtm/medrol-dosepak.html.

[2]Vicodin contains a combination of the pain killers acetaminophen and hydrocodone. Hydrocodone is an opioid pain medication, sometimes called a narcotic. Acetaminophen is a less potent pain reliever that increases the effects of hydrocodone.  Vicodin is used to relieve moderate to severe pain.  http://www.drugs.com/vicodin.html.

[4]Flexeril (cyclobenzaprine) is a muscle relaxant.  http://www.drugs.com/flexeril.htm.

[5]Plaintiff returned to work in July 2009 but suffered a recurrent low back injury in November 2009, after which she remained off work.  (Tr. at 281, 286, 291, 365.)

encouraged her to pursue evaluation with DVR.[6]  (Tr. at 349-50.)  Dr. Gorelick provided additional injections (Tr. at 342, 347), but the benefits were only transient (Tr. at 339).  In October 2010, Dr. Gorelick started plaintiff on Cymbalta[7] for neuropathic pain (Tr. at 339-40), but plaintiff experienced side effects including nausea and headaches and stopped taking it (Tr. at 400).

On December 1, 2010, plaintiff reported that she could lift a gallon of milk but had to do it from the waist up; sit for 30-120 minutes based on if she was having a better or worse day; stand from 30-60 minutes at a time; and walk maybe two blocks on a good day.  She would lay down once or twice per day for up to an hour.  If she went grocery shopping, it took her two hours because she had to hold on to the cart.  (Tr. at 400.)  Dr. Gorelick recommended that she use an electric scooter and switched her from Cymbalta to Lexapro (also an anti-depressant).[8]  (Tr. at 401.)  He also indicated that she was to remain off work indefinitely with restrictions of lifting/carrying up to 10 pounds infrequently and up to five pounds more often; pushing/pulling up to 10 pounds; avoidance of repetitive bending, twisting, or lifting; avoidance of climbing or crawling; stretching for five minutes every hour with prolonged activity; working four hours per day, five days per week, maximum; alternating sitting, standing, and walking as necessary; and use of an ergonomic chair for prolonged sitting.  (Tr. at 401.)

On December 15, 2010, plaintiff reported that the Lexapro caused side effects so severe

---

[6]The Wisconsin Division of Vocational Rehabilitation ("DVR") helps individuals with disabilities locate employment.  http://dwd.wisconsin.gov/dvr/.

[7]Cymbalta, an anti-depressant, is also used to treat pain caused by nerve damage (neuropathy).  http://www.drugs.com/cymbalta.html.

[8]http://www.drugs.com/lexapro.html.

she had to go to the emergency room.  (Tr. at 397.)  Dr. Gorelick continued her on Vicodin and cyclobenzaprine.  (Tr. at 398.)  On January 10, 2011, Dr. Gorelick reiterated the work restrictions from December 1, 2010, adding that she would need to take unscheduled breaks two to three times per day and would miss one to two days per month due to flared pain.  (Tr. at 395.)  On February 9, 2011, Dr. Gorelick indicated that these restrictions would be permanent.  (Tr. at 391.)  On March 9, 2011, plaintiff reported doing worse after a fall in her home.  She related that she stayed home except for food shopping, which she did with her mother and the assistance of an electric cart.  (Tr. at 388.)  Dr. Gorelick recommended physical therapy and kept her off work under the restrictions from January 10, 2011.  (Tr. at 389.)

Plaintiff returned to Dr. Gorelick on July 6, 2011, reporting that overall she was about the same.  She was performing home exercises and using a TENS unit,[9] which helped while the unit was on but with no carryover.  She was using three to four Vicodin tablets per day for pain control, in addition to one to two cyclobenzaprine tablets at night to help with sleep.  Dr. Gorelick reiterated the restrictions from January 2011 and renewed Vicodin.  He kept physical therapy on hold, as plaintiff's insurance only covered a certain number of sessions per year.  (Tr. at 659-60.)

On July 13, 2011, after plaintiff filed her application for benefits, the agency obtained a report from a non-examining consultant, Dr. Mina Khorshidi.  Dr. Khorshidi opined that plaintiff could sustain sedentary work.  (Tr. at 431-38.)

---

[9]Transcutaneous electrical nerve stimulation ("TENS") is a therapy that uses low-voltage electrical current for pain relief.  The treatment is administered by connecting electrodes from a small, battery-powered machine to the skin.  The electrodes are placed on the area of pain or at a pressure point, creating a circuit of electrical impulses that travels along nerve fibers. http://www.webmd.com/pain-management/tc/transcutaneous-electrical-nerve-stimulation-te ns-topic-overview.

4

On October 12, 2011, plaintiff reported an escalation of pain. She indicated that the medication did not "take as much of the edge off anymore." (Tr. at 662.) Dr. Gorelick switched her from Vicodin to Norco[10] and ordered a physical therapy evaluation.[11] (Tr. at 663.) On November 23, 2011, plaintiff reported feeling about the same, despite six therapy sessions. (Tr. at 665.) Dr. Gorelick provided another injection and continued her medication and therapy. (Tr. at 666.)

On January 9, 2012, Dr. Gorelick re-stated plaintiff's restrictions: lifting/carrying up to 10 pounds rarely, up to five pounds infrequently; no pushing/pulling greater than 10 pounds infrequently; no repetitive bending, twisting, or lifting; no climbing, crawling, or squatting; walking limited to ½ block before stopping; static sitting for up to 30 minutes at a time with use of an ergonomic chair; static standing for up to 15 minutes; stretching for five minutes every hour with prolonged activities; alternating between sitting, standing, and walking at will; and taking unscheduled breaks two times per day, with pain and medication interfering with concentration. Dr. Gorelick concluded that plaintiff could, within this capacity, work four hours per day maximum, five days per week maximum. Within this capacity, he anticipated that she would miss two to three days of work per month due to flared pain symptoms. (Tr. at 565.)

On February 8, 2012, plaintiff reported feeling mildly to moderately better after the November 2011 injection, but over time her symptoms slowly escalated back to the previous level. She was unable to continue in physical therapy due to lack of funds, but she was doing

---

[10]Norco contains a combination of acetaminophen and hydrocodone and is used to relieve moderate to severe pain. http://www.drugs.com/norco.html.

[11]Records from Affiliated Health of Wisconsin indicate that plaintiff underwent physical therapy from October 2011 to February 2012, when she discharged secondary to exhaustion of her benefits. (Tr. at 566-76.)

home exercises and stretching.  (Tr. at 669.)  Dr. Gorelick continued her medications and recommended a repeat MRI.  (Tr. at 670-71.)

On April 18, 2012, plaintiff reported feeling about the same.  She was not in physical therapy but had just started water aerobics.  (Tr. at 673; 609.)  Dr. Gorelick continued medications and again suggested a repeat MRI.  (Tr. at 674.)

On July 18, 2012, plaintiff again reported feeling about the same.  She found her medication of some help.  Dr. Gorelick suggested a Cymbalta trial, continued Norco and Flexeril, and recommended continued exercise.[12]  (Tr. at 677.)

## B.    Hearing Testimony

At her November 14, 2012, hearing before the ALJ, plaintiff testified that she was 37 years old, 5'6" tall, and 295 pounds.  (Tr. at 36, 40-41.)  She indicated that her weight had increased from 265 pounds over the past year due to inactivity.  (Tr. at 41.)  She was single, with two children, ages 12 and eight.  (Tr. at 42.)  She lived in half of a duplex with her children; her mother occupied the upstairs portion of the house.  (Tr. at 42.)  Plaintiff testified that she had a driver's license, and that she sometimes drove her kids to school and her mother to appointments.  (Tr. at 44-45.)  She had a 12th grade education and no additional vocational training.  (Tr. at 45.)

Plaintiff testified that her primary problem was her back (Tr. at 45), which caused pain radiating down her left leg (Tr. at 64).  She was also overweight, which put additional stress on her joints.  (Tr. at 46-47.)  Plaintiff also had type 2 diabetes, but she reported no diabetic

---

[12]On September 26, 2012, plaintiff under went a repeat MRI, which showed, since the previous scan from 2009, enlargement of a left central L4-5 disc protrusion with possible compression of the left L5 nerve root.  The small inferior midline L3-4 disc extrusion may have also enlarged.  It further showed mild L3-4, L4-5 disc degeneration.  (Tr. at 657-58.)

retinopathy or peripheral neuropathy related to that condition. (Tr. at 47-48.) For pain, she took Vicodin or hydrocodone and a muscle relaxant. (Tr. at 51.) The medication took the edge off her pain but did not take it away. (Tr. at 51-52.) Dr. Gorelick had tried different things for pain, including a trial of Cymbalta, but she had a reaction to that. (Tr. at 53.) She had also used a TENS unit, which took the edge off but did not keep the pain away. (Tr. at 53-54.) Plaintiff testified that she would lie down six to seven times per day, for ½ to two hours, to alleviate pain. (Tr. at 55-57.) She also did stretching exercises. (Tr. at 57-58.) One of her doctors had suggested spinal fusion surgery but indicated that she was not a good surgical candidate due to her age and weight. (Tr. at 59-60.) She also underwent epidural injections for her back, which provided temporary relief only. (Tr. at 60-61.)

Plaintiff testified that she was able to tend to her self care, so long as it did not involve bending. (Tr. at 68.) She cooked simple meals; her kids did the dishes, general house cleaning, and laundry (under her supervision). (Tr. at 69-70.) She grocery shopped with her mother and children. (Tr. at 70-71.) She testified that she did not go out of the house that much. (Tr. at 72.) She had tried water therapy for four weeks before stopping. (Tr. at 73-74.) Her only hobby was reading, which she did one to two hours per day. (Tr. at 76.) She had three dogs, but her kids walked them or let them out in the fenced yard. (Tr. at 77.)

Plaintiff testified that her pain got worse after 15 minutes of sitting, requiring her to stand up and move around. After rotating from sitting to standing she would eventually have to lie down. (Tr. at 79.) She also complained of sharp pain after walking ½ block. (Tr. at 80.) She indicated that the longest she would go without lying down was two hours. (Tr. at 80-81.) Plaintiff cared for her mother by driving her to doctors' appointments; her mother was able to cook for herself; the assistance was mostly driving. (Tr. at 81.)

The ALJ summoned a vocational expert ("VE") to the hearing, and the VE classified plaintiff's past jobs as light and medium, semi-skilled work. (Tr. at 84.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, limited to sedentary work with only occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. at 84-85.) The VE testified that such a person could not perform plaintiff's past work but could do other jobs, including order clerk, office assistant, video surveillance monitor, machine tender, and assembler. These were all unskilled, sedentary jobs. (Tr. at 85.) If the person could only work four hours per day, she would not be competitively employable. (Tr. at 85-86.) If the person had to lie down for in excess of two hours per day, she would also not be competitively employable. (Tr. at 86.) Leaving the work station to walk around would also be unacceptable, as would being absent more than twice per month. (Tr. at 88.)

## C.    ALJ's Decision

On December 17, 2012, the ALJ issued an unfavorable decision. (Tr. at 16.) The ALJ determined that plaintiff had not worked since November 18, 2009, her alleged disability onset date, and that she suffered from the severe impairments of degenerative disc and joint disease in the lumbar spine, obesity, and type II diabetes, none of which qualified as conclusively disabling. (Tr. at 21-22.) The ALJ then determined that plaintiff retained the residual functional capacity ("RFC") to perform sedentary work with only occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. at 22.) In making this finding, the ALJ discounted plaintiff's statements regarding the severity of her symptoms and credited the medical opinion of the agency consultant, Dr. Khorshidi, over Dr. Gorelick. (Tr. at 22-25.) The ALJ then determined that plaintiff was unable to perform her past work, which the VE testified was done

at the medium and light levels. (Tr. at 25.) However, he found that she could do other jobs as identified by the VE, including order clerk, office assistant, video surveillance monitor, machine tender, and assembler. (Tr. at 26.) The ALJ accordingly found her not disabled and denied the application. (Tr. at 27.)

## II. STANDARD OF REVIEW

The court reviews an ALJ's decision to ensure that he supported it with substantial evidence, meaning such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Murphy v. Colvin, 759 F.3d 811, 815 (7th Cir. 2014). Under this deferential standard, the court may not re-weigh the evidence or substitute its judgment for the ALJ's. Id. But deferential review is not abject; the court must ensure that the ALJ considered the important evidence and built a logical bridge from the facts to the conclusion. Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010). The court will reverse and remand if the ALJ committed an error of law, based the decision on serious factual mistakes or omissions, or relied on evidence that does not support his conclusion. Beardsley v. Colvin, 758 F.3d 834, 837 (7th Cir. 2014).

## III. DISCUSSION

The ALJ erred in evaluating credibility and Dr. Gorelick's reports. I address each issue in turn.

### A.  Credibility

#### 1.  Legal Standards

In evaluating the credibility of a claimant's statements about her symptoms and limitations, agency rules require the ALJ to first determine whether the claimant suffers from

9

a medically determinable physical or mental impairment that could reasonably be expected to produce the symptoms. SSR 96-7p, 1996 WL 374186, at *2. If the claimant suffers from no such impairment(s), or if the impairment(s) could not reasonably be expected to produce the symptoms, the symptoms cannot be found to affect her ability to work. Id. If the ALJ finds that the claimant's impairment(s) could produce the symptoms alleged, he must then determine the extent to which the symptoms limit the claimant's ability to work. Id. For this purpose, whenever the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record, including the claimant's daily activities; the duration, frequency, and intensity of the symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; and any other measures or treatment the claimant uses to relieve the symptoms. Id. at *2-3. The ALJ may not reject the claimant's statements based solely on a lack of objective medical support. See, e.g., Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009).

The reviewing court will give "an ALJ's credibility determination special, but not unlimited, deference." Shauger v. Astrue, 675 F.3d 690, 696 (7th Cir. 2012). The ALJ must consider the pertinent regulatory factors and then provide specific reasons for his credibility determination, supported by the evidence in the case record and articulated in the decision. See SSR 96-7p, 1996 WL 374186, at *4; Shauger, 675 F.3d at 696. The court need not defer to a credibility determination based on errors of fact or logic. Allord v. Barnhart, 455 F.3d 818, 821 (7th Cir. 2006).

## 2. Analysis

### a. Use of Boilerplate

In the present case, the ALJ first summarized plaintiff's allegations that was she was disabled by the residuals of her back injury, as a result of which she experienced chronic, radiating low back pain. Plaintiff alleged that severe pain limited her ability to walk for an extended period, stand for more than an hour, lift from below the waist, squat, and bend. She further testified that pain required her to lie down six to seven times per day from ½ to two hours. She indicated that she was dependant on her children to maintain her household. (Tr. at 22.)

The ALJ then stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. at 22-23.) The Seventh Circuit has repeatedly criticized this language as meaningless boilerplate. See, e.g., Bjornson v. Astrue, 671 F.3d 640, 644-45 (7th Cir. 2012). "The implication is that the assessment (of the claimant's residual functional capacity – that is, ability to work) precedes and may invalidate the claimant's testimony about his or her ability to work. Actually that testimony should be an input into a determination of ability to work." Goins v. Colvin, 764 F.3d 677, 681 (7th Cir. 2014).

Nevertheless, use of the boilerplate may be harmless if the ALJ goes on to provide more specific reasons for his credibility finding. See, e.g., Moore v. Colvin, 743 F.3d 1118, 1122 (7th Cir. 2014). In this case, the ALJ provided several reasons for his determination, but none of

11

them withstand scrutiny.

### b. Other Reasons

#### i. Daily Activities

The ALJ first found that, despite her allegations of disabling symptoms, plaintiff's activities supported his RFC. The ALJ noted that plaintiff was independent in her personal care, cared for her children, tended to the family's dogs, cleaned, shopped, did the laundry, and drove. In her written reports, she listed hobbies including playing with her children, watching television, drawing, and reading. The ALJ also noted that in January 2012 plaintiff reported that she was sexually active and considering having another child, which could exacerbate her back pain and result in gestational diabetes. In July 2012, plaintiff reported being the primary care-giver for her mother; however, she denied this statement at the hearing, indicating that she merely drove her mother to appointments. (Tr. at 23.)

The regulations require an ALJ to consider a claimant's daily activities, but "this must be done with care." Roddy v. Astrue, 705 F.3d 631, 639 (7th Cir. 2013). The Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." Id. This is so because the "pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office." Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006).

In this case, the ALJ cited a number of activities but overlooked plaintiff's limitations in their performance. In her written function report, plaintiff alleged significant limitations in personal care, indicating that she needed help with socks and shoes and shaving her legs, and

that using the toilet was hard because of the bending.  (Tr. at 218.)  She wrote that she prepared simple meals, and sometimes needed help with the pots and pans.  She did some cleaning and laundry with help.  (Tr. at 219.)  She shopped once per week, and it took one to two hours because she had to take breaks.  (Tr. at 220.)  She listed hobbies of playing with her children, drawing, reading, and watching TV, but said that she could not do these things for long; she had to take breaks and change positions, and she could not ride bikes, run, or play games outside with her children.  (Tr. at 221.)  Similarly, at the hearing, plaintiff testified that she was able to tend to her self care if it did not involve bending (Tr. at 68); her children did the lion's share of the housework (Tr. at 69-70); she grocery shopped with her mother and children (Tr. at 70-71); and her kids walked the dogs (Tr. at 77).  The ALJ recognized none of these limitations; if he disbelieved that plaintiff was so limited, he did not say it.

Nor did the ALJ explain how sexual activity, presumably done lying down, diminished plaintiff's credibility.  The specific notes the ALJ cited on this point discussed whether a statin (a cholesterol reducing drug)[13] should be added given plaintiff's consideration of having another child (Tr. at 643, 646); another note recorded plaintiff's history of gestational diabetes (Tr. at 647).  The medical evidence does not support making her consideration of having another child a strike against her credibility.  See Wiersma v. Astrue, No. 10-C-240, 2010 WL 5095318, at *12 (E.D. Wis. Dec. 8, 2010) ("[A] person's desire to have children may cause her to be willing to endure additional pain.").

Finally, while plaintiff did tell a provider on July 20, 2012, that she was the "primary

---

[13]http://www.nlm.nih.gov/medlineplus/statins.html.  "Statins are relatively safe for most people.  But they are not recommended for pregnant patients or those with active or chronic liver disease."  Id.

caregiver for her mother" (Tr. at 614), at the hearing plaintiff explained that this mostly involved driving her mother to medical appointments (Tr. at 81). The ALJ wrote that at the hearing plaintiff "denied" the statement she made to the provider (Tr. at 23), but a review of the transcript shows that plaintiff admitted being her mother's primary caregiver but went on to explain that this mostly meant driving her mother to the doctor. (Tr. at 81.) The ALJ did not find this explanation incredible, nor did he cite any evidence suggesting that plaintiff did more for her mother than she claimed. More importantly, he did not explain how any of the services plaintiff performed for her mother (or her children) undermined her credibility. See Beardsley, 758 F.3d at 838 (rejecting ALJ's reliance on care the claimant provided for her mother where those tasks did not equate with work); Gentle v. Barnhart, 430 F.3d 865, 867 (7th Cir. 2005) ("Gentle must take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts.").

### ii. Conservative Treatment

The ALJ's second reason for discounting plaintiff's credibility was her "conservative" treatment. (Tr. at 23.) As the ALJ himself recognized, though, plaintiff received a wide array of treatments for her pain – including narcotic pain medication, epidural steroid injections, physical therapy, home-based exercises, and water aerobics – which cannot reasonably be characterized as conservative. See, e.g., Fowler v. Colvin, No. 1:13-cv-01092, 2014 WL 4840582, at *8 (S.D. Ind. Sept. 29, 2014) ("The Court questions whether treatment with high doses of narcotics such as OxyContin and methadone can be considered 'conservative' treatment."); Solleveld v. Colvin, No. 12 CV 10193, 2014 WL 4100138, at *6 (N.D. Ill. Aug. 20, 2014) ("Although in some cases conservative treatment may contradict the severity of the limitations alleged, here the record shows that Solleveld was prescribed narcotics, including

Vicodin and Norco, numerous times over her treatment history.  See Schomas v. Colvin, 732 F.3d 702, 709 (7th Cir. 2013) (contrasting 'conservative' treatment like over-the-counter medication with 'more aggressive' treatment like prescription narcotics and steroid injections)."); see also Carradine v. Barnhart, 360 F.3d 751, 755 (7th Cir. 2004) (finding it improbable that the claimant would have undergone the pain-treatment procedures that she did, including heavy doses of strong drugs such as Vicodin, "merely in order to strengthen the credibility of her complaints of pain and so increase her chances of obtaining disability benefits").  Indeed, short of surgery, it is hard to see what else remained.  And as the ALJ himself recognized, in February 2010 plaintiff was told that she likely would be a proper candidate for lumbar fusion surgery if not for her weight and young age.  (Tr. at 23, 279.)

The ALJ noted that plaintiff testified that her treatment had been ineffective, but in the treatment notes she admitted to pain relief with medication, injections, and therapy. (Tr. at 23.) This sort of contradiction might reasonably diminish a claimant's credibility, but the record does not support the ALJ's finding in this case.  Plaintiff consistently reported to her providers that while treatment provided some relief, her pain never abated (Tr. at 284 – medications helped the pain somewhat; Tr. at 307 – injections provided some relief, but she still had problems; Tr. at 339 – transient benefits from injection; Tr. at 346 – medications took the severity of the pain down, but it was still fairly constant and got worse with activity; Tr. at 349 – minimal changes with therapy; Tr. at 355 – slight improvement with therapy and injections; Tr. at 362 – pain not getting any better, continued to fluctuate; Tr. at 384 – pain a little better with therapy; Tr. at 400 – hydrocodone helped, but the pain continued; Tr. at 659 – TENS unit helped while it was on but with no carryover; Tr. at 662 – hydrocodone did not take as much of the edge off anymore; Tr. at 665 – pain about the same despite further therapy; Tr. at 669 – injection helped for about

15

a month, but the symptoms slowly escalated back to the previous level; Tr. at 677 – Norco of some help), which is just what she said at the hearing (Tr. at 51-52).

### iii.    Physical Exam Findings

The ALJ's third reason was that plaintiff's subjective complaints and alleged limitations were inconsistent with the physical exam findings.  He cited a November 2009 finding of normal, symmetrical lower extremity strength, with negative straight leg raise; an October 2010 report that she was able to do daily home-based exercises; and a March 2011 note from Dr. Gorelick indicating that, despite a recent exacerbation of pain after a fall, she was able to bend with some difficulty, get into a supine position independently but slowly, and was able to dress and undress albeit slowly.  (Tr. at 23-24.)  The ALJ did not explain how these snippets from the record supported his finding.  The straight leg raise test is designed to determine whether a patient with low back pain has an underlying herniated disk, <u>Allen v. Colvin</u>, 942 F. Supp. 2d 814, 819 n.5 (N.D. Ill. 2013), but the MRI scans in the record document disc protrusions in plaintiff's back (Tr. at 267, 657-58.)  The ALJ did not discuss the extent of plaintiff's exercise program, and, as discussed below, it is a questionable tactic to hold therapeutic exercise against a claimant.  Finally, in March 2011, Dr. Gorelick found plaintiff severely limited and unable to return to work.  (Tr. at 389.)

The ALJ noted that in August 2011 plaintiff complained of another exacerbation but admitted that she had not been attending therapy.  Plaintiff made this statement to a physician's assistant during a follow up regarding her diabetes.  (Tr. at 577.)  Dr. Gorelick's notes confirmed that plaintiff was unable to attend therapy at that time because her insurance only covered a certain number of visits per year.  (Tr. at 659-60.)  <u>See</u> SSR 96-7P, 1996 WL 374186, at *7-8 (stating that the ALJ must not draw any inferences about an individual's

symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, such as inability to afford treatment). As the ALJ himself noted, plaintiff did recommence therapy later that year. (Tr. at 24, 566-76.)

The ALJ also stated that he found no medical evidence supporting plaintiff's statement that she needed to lie down numerous times per day. However, Dr. Gorelick noted this during his initial consultation. (Tr. at 368.) The ALJ was also troubled by the fact that providers consistently encouraged plaintiff to exercise. "Recommendations for exercise are inconsistent with any medical need to lie down." (Tr. at 24.) The ALJ provided no support this statement, which is contrary to the cases recognizing the value of therapeutic exercise. See, e.g., Scrogham, 765 F.3d at 701 (citing Carradine, 360 F.3d at 756; Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001)). There is no apparent inconsistency between light exercise, such as stretching, and lying down periodically throughout the day. See Jordan v. Astrue, 262 Fed. Appx. 843, 845 (9th Cir. 2008) ("Although Jordan did help with some light household chores, did some therapeutic exercises, and was briefly self-employed, these facts are not inconsistent with Jordan's stated need to alleviate his pain by lying down regularly."); Allyn v. Astrue, No. 08-132, 2009 WL 2970425, at *1 (N.D. Iowa Sept. 16, 2009) (finding that a recommendation of exercise was not inconsistent with the need to lie down and take many breaks during the course of a day); Field v. Astrue, No. 08-4079, 2009 WL 1212044, at *11 (D. Kan. May 5, 2009) (reversing where the ALJ provided no medical support for his finding that a doctor's "recommendation of a regular exercise program is 'absolutely inconsistent with any medical need to lie down'"). At the very least, the ALJ should have explained how the specific forms of exercise plaintiff performed contradicted her claimed limitations. Avitia v. Colvin, No. 14-C-

17

12, 2014 WL 4267459, at *7 (E.D. Wis. Aug. 28, 2014) ("[T]he ALJ failed to explain why the recommendation from plaintiff's therapist (and also his cardiologist) that plaintiff regularly exercise was inconsistent with plaintiff's claims.").[14]

The ALJ further noted that plaintiff failed to consistently follow dietary and exercise recommendations, leading to insulin dependency and an increase in her weight. (Tr. at 24.) The ALJ also noted that plaintiff was advised if she lost weight she would likely be a proper candidate for a lumbar fusion. (Tr. at 25.) However, the ALJ pointed to no evidence suggesting that weight loss would restore plaintiff's ability to work. See Nichols v. Colvin, No. 11–cv–697, 2013 WL 5719433, at *13 (W.D. Wis. Oct. 21, 2013) ("Construing Nichols' failure to lose weight as noncompliance with a medical recommendation is a misuse of this regulation."); see also Barrett v. Barnhart, 355 F.3d 1065, 1068 (7th Cir. 2004) (reversing where ALJ considered the claimant's obesity a self-inflicted disability without considering the cause). The medical evidence suggested that even when she was lighter plaintiff experienced severe pain. During her initial consult with Dr. Gorelick in March 2010, plaintiff stated that her weight was down 60 pounds, yet she still had significant functional limitations. (Tr. at 366.) In any event, as Judge Clevert noted in McMurtry v. Astrue, 749 F. Supp. 2d 875, 891 (E.D. Wis. 2010), whether a claimant's weight might drop in the future does not address her condition at the time of decision. Finally, the ALJ's suggestion that plaintiff's failure to diet, exercise, and

---

[14]In a letter submitted to the Appeals Council, Dr. Gorelick stated that the primary foundation for rehabilitation for people with chronic conditions is therapeutic exercise. "When people are engaged in home exercise, it does not imply they live without limitations." (Tr. at 684.) Because this letter was not before the ALJ, I may not rely on it to reverse. Diaz v. Chater, 55 F.3d 300, 305 n.1 (7th Cir. 1995). However, the sentiments Dr. Gorelick expressed are consistent with the cases cited in the text criticizing ALJs for relying on a claimant's performance of therapeutic exercise.

lose weight diminished her credibility contradicts his earlier statement that her participation in an exercise program meant that her problems could not be as severe as she claimed.

## B.    Dr. Gorelick

### 1.    Legal Standard

A treating doctor's medical opinion regarding the nature and severity of the claimant's impairment is entitled to "special significance" in determining RFC.  SSR 96-8p, 1996 WL 374184, at *7.  If the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the record, the ALJ must give it "controlling weight."  20 C.F.R. § 404.1527(c)(2).  If the ALJ finds that a treating doctor's opinion does not meet the standard for controlling weight, he may not simply discard it; rather, he must determine what weight the opinion does deserve by considering a variety of factors, including the length, nature, and extent of the claimant and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist. Scrogham, 765 F.3d at 697.  The ALJ must always offer "good reasons" for discounting the opinion of a treating physician.  Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011).

### 2.    Analysis

In this present case, the ALJ adopted the agency consultant's opinion over the views of Dr. Gorelick, plaintiff's long-time pain management specialist.  The ALJ summarized Dr. Gorelick's opinions, before concluding:

> The undersigned has considered these assessments and assigns them little weight, as they are not well supported.  The claimant reports activities as indicated throughout this decision that exceed these limitations.  In addition, she admitted that she could concentrate and focus well.  Moreover, exercise has

been consistently recommended as a primary treatment modality which is inconsistent with Dr. Gorelick's proposed the [sic] limitations.

(Tr. at 25.)  For essentially the same reasons discussed above, plaintiff's activities provide no support for the ALJ's rejection of Dr. Gorelick's opinion.  The ALJ pointed to no specific activity exceeding any specific limitation imposed by Dr. Gorelick.  As also discussed above, a recommendation of therapeutic exercise is not inconsistent with disabling limitations.  The ALJ provided no other reasons for finding Dr. Gorelick's opinions unsupported.

The ALJ assigned "significant weight" to Dr. Khorshidi's opinion that plaintiff was capable of sedentary work, as that opinion was "well-supported by the evidence and consistent with the residual functional capacity set forth in this decision."  (Tr. at 25.)  Much like the credibility determination discussed above, this statement got things backwards, finding the opinion reliable because it matched the ALJ's RFC.  See Browning v. Colvin, 766 F.3d 702, 707 (7th Cir. 2014) ("The implication . . . is that residual functional capacity (ability to engage in gainful employment) is determined before all the evidence relating to the claimed disability is assessed, whereas in truth all that evidence is material to determining the claimant's residual functional capacity.").  Nor did the ALJ explain how the evidence supported Dr. Khorshidi's opinions.  Finally, the contradictory opinion of a non-examining physician does not, by itself, suffice to reject a treating source report.  Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003).

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this matter is **REMANDED** for further proceedings consistent with this decision.[15]  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 24th day of November, 2014.

/s Lynn Adelman
LYNN ADELMAN
District Judge

---

[15]In her reply brief, plaintiff asks for an immediate award of benefits.  However, that is appropriate only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports but one conclusion – that the applicant qualifies for disability benefits.  Allord, 631 F.3d at 415.  For the reasons set forth in the text, this case must be returned to the ALJ for reconsideration of credibility and the medical source opinons.